# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### November 13, 2013 Session

## STATE OF TENNESSEE v. CORDELL REMONT VAUGHN

**Appeal from the Circuit Court for Perry County**
**No. 2006CR932      James G. Martin, III, Judge**

**No. M2012-01153-CCA-R3-CD - Filed April 17, 2014**

A Perry County Grand Jury returned an indictment against Defendant, Cordell Remont Vaughn, charging him with first degree murder. After Defendant's first trial, this court reversed a jury's verdict that found Defendant guilty of first degree murder. *State v. Vaughn*, 279 S.W.3d 584, 586-87 (Tenn. Crim. App. 2008). Pursuant to a second jury trial, Defendant was again found guilty of first degree murder. He was sentenced to life in prison without the possibility of parole. The trial court granted Defendant's motion for new trial. The State filed a Rule 10 application for an extraordinary appeal with this court, which was granted. On appeal, this court reversed the trial court's granting of a new trial. *State v. Vaughn*, No. M2011-00067-CCA-R10-CD, 2012 WL 1484191 (Tenn. Crim. App. April 25, 2012) *perm. app. denied* (Tenn. Aug. 16, 2012). On May 31, 2013, the trial court entered judgment and sentenced Defendant again to life in prison without the possibility of parole. On appeal, Defendant argues: (1) the evidence was not sufficient to support his first degree murder conviction; (2) that the trial court erred in denying his motion to suppress the toxicology report; and (3) whether his right to be free from double jeopardy was violated. After a review of the record, we affirm Defendant's conviction of first degree murder; we reverse the sentence of life without possibility of parole and remand this case to the trial court for entry of a judgment of conviction of first degree murder with a sentence of life imprisonment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed in Part; Reversed in Part; and Remanded for Entry**
**of a Judgment of First Degree Murder with a Sentence of Life Imprisonment**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Douglas Thompson Bates, IV, Centerville, Tennessee, for the appellant, Cordell Remont Vaughn.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Kim R. Helper, District Attorney General; and Stacey B. Edmonton, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Background**

On the evening of February 17, 2005, Anthony Head was at his home located at 229 Pine Street in Linden watching television. At some point, Chandra Vaughn knocked on his door. When he answered the door, Mr. Head noticed that Ms. Vaughn was hysterical, and she had a little girl with her. Ms. Vaughn said that someone was shooting in her house next door. She left the little girl with Mr. Head, borrowed his cordless phone, and went back to the house. Mr. Head's wife, Denise, arrived home with Paula Fisher, who was driving the vehicle. Mr. Head motioned for his wife to come into the house because something was going on. After she got inside, there was another knock at the door, and when Mr. Head opened the door, Defendant fell into the kitchen. Defendant's shirt was bloody, and Mr. Head told his wife to call paramedics. Mr. Head testified that he had previously seen Defendant at the back of his house "talking to or motioning with" a middle-aged black male. While Defendant was laying on the kitchen floor, Mr. Head heard him say, "She stabbed me." Mr. Head also testified that Defendant "wasn't in his right mind." He thought that Defendant seemed "high." Paramedics arrived at Mr. Head's residence and began working on Defendant. Defendant did not mention that anyone else was injured.

On cross-examination, Mr. Head testified that Defendant was on parole when he first met Defendant. Mr. Head noted that he performed a lot of work at Defendant's house, and they became "pretty good friends." However, several days before February 17, 2005, Mr. Head noticed that Defendant appeared to be under the influence of something and was not himself. He said that Defendant was "real ornery," and he knocked Mr. Head's hat off his head for no reason. After that, Mr. Head did not return to Defendant's house.

Denise Head testified that when she arrived home from shopping with Paula Fisher in the late afternoon of February 17, 2005, the day of the shooting, she saw Defendant standing outside with another gentleman. Her husband then motioned for her to come inside the house. Mrs. Head testified that her husband seemed upset, and he told her that something had been happening next door. There was also a little girl in the house. She appeared to be six or seven years old, and Mrs. Head did not recognize the child. Mrs. Head walked back

outside and told Ms. Fisher, who was still in the driveway, to leave. She then went back inside and called Ms. Fisher to let her know what was happening. Mrs. Head testified that Mr. Head told her that there had been a shooting and that the little girl was Chandra Vaughn's niece.

When Mrs. Head walked into the kitchen with her groceries, there was a knock at the door. She said that the doorknob turned, and Defendant walked in and fell. Mrs. Head noticed that Defendant "was bleeding on his chest," and he said that he had been stabbed. Defendant also had the cordless phone that Ms. Vaughn had borrowed, and Mrs. Head used it to call 911. Mrs. Head noted that Defendant's eyes were rolling back in his head, and she thought that he was going to become unconscious.

Mrs. Head testified that a couple of days before the shooting, Defendant was walking his dog, and it began fighting with Mrs. Head's dog in her yard. She said that she began "screaming and yelling" at Defendant to get off her property, but Defendant did not respond to her. She said that Defendant appeared to be in "another world," and "[i]t was like he didn't even hear what was going on around him." Mrs. Head testified that she then called Defendant's wife, who was still his girlfriend at the time, and told her that she needed to do something with Defendant. Mrs. Head felt that something was wrong with Defendant. She said that she had never known Defendant to use drugs.

Paula Fisher was deceased at the time of trial. Her testimony from a prior hearing was read into evidence. Ms. Fisher, at the prior hearing, testified that on February 17, 2005, she and Ms. Head were driving down Pine Street to Ms. Head's residence when Ms. Fisher saw Defendant and another person in the road. She said: "They were struggling and wrestling, sort of in the waist area over something. It was small, so I couldn't see what they were wrestling for, but they were tugging back and forth for something."

Ms. Fisher testified that when she and Ms. Head pulled into the driveway, Mr. Head walked out the side door of the house yelling for Ms. Head to get inside the house. Ms. Head went inside and then walked back out and told Ms. Fisher to "get out of here now. Something has happened. Something bad has happened." Ms. Fisher was watching the struggle going on behind her, and she finally saw Defendant and the other person "break apart." Ms. Fisher then drove away and began looking for a police officer. She saw Officer Dillingham and told him that something bad had happened behind the Head's residence. As Ms. Fisher was speaking to the officer, he received a dispatch. On cross-examination, Ms. Fisher testified that Defendant walked north toward his house after he parted ways with the other man.

-3-

Johnny Hester, Defendant's friend and employee, testified that he lived with Defendant for a short period of time and added a bathroom to the house. Mr. Hester testified that he lived in a one room house on Defendant's property. The building was located approximately one-hundred feet from Defendant's house. Mr. Hester testified that he was living there on February 17, 2005. On that date he and another gentleman were painting the drywall in the newly added bathroom. He thought that the other gentleman was related to Defendant. Mr. Hester testified that at approximately 12:30 p.m., Catricia Candace McPheters (the victim) fixed him and the other gentleman some lunch, and they sat down to eat after the victim said a prayer. Mr. Hester testified that the victim had a paring knife and indicated that she was mad at Defendant and was going to stab him. Defendant was not at the residence at the time, but arrived back at approximately 3:00 to 3:30 p.m.

Mr. Hester testified that Defendant's wife and "the daughter" were with him when he returned. Defendant inspected the bathroom and indicated that he was pleased with the work that Mr. Hester and the other gentleman were doing. The victim was still in the house at the time. Mr. Hester testified that he walked out to his building at approximately 4:30 to 5:00 p.m. to take a break and wait for a coat of paint to dry. While Mr. Hester was in the building, he heard a man and a woman arguing. After a period time, Mr. Hester then heard gunshots. He thought that he heard approximately five shots. Mr. Hester then looked out the door and saw Mrs. Vaughn, a little girl, and the man who had been helping him walk through the back gate and down the driveway.

Mr. Hester testified that he shut the door and sat there for approximately ten minutes. He then left the building, walked through the gate and around the house. Mr. Hester walked in the front door of the house and saw "stuff, clothes flung everywhere." It also appeared that flour had been spilled. Mr. Hester walked out the back door of the house and saw the victim laying at the bottom of the steps, and Defendant was beside her trying to get her to wake up. Defendant then asked Mr. Hester to perform CPR on the victim. Mr. Hester testified that he checked for a pulse and told Defendant that he thought the victim was dead. After that, Mr. Hester walked back to his building and shut the door. Defendant then knocked on the door, and when Mr. Hester walked out, Defendant attempted to hand him a pistol and asked Mr. Hester to dispose of it. When Defendant turned around and walked away, Mr. Hester "slung [the gun] off in the weeds." Mr. Hester walked back inside his building, and a short time later someone from the sheriff's office knocked on the door and then placed him into custody. He was ultimately not charged with any offense related to the present case.

Ronnie Tucker, Defendant's brother-in-law, testified that the victim was Mr. Tucker's daughter-in-law and the mother of his granddaughter. At the time of the shooting, Mr. Tucker had been in Perry County for two or three days helping Defendant remodel a

bathroom. The victim had come to Perry County with him. At some point while Mr. Tucker was under the house "trying to get it jacked up," he heard gunshots. He had previously heard Defendant and the victim arguing, but he did not how long they had argued because he was in and out of the room. Mr. Tucker crawled out from under the house and saw the victim lying on the sidewalk. He touched the victim, but she was not moving or talking. Mr. Tucker walked inside the house and saw Defendant standing in the kitchen, and Mrs. Vaughn and a little girl were leaving the house. He asked Defendant what happened, and Defendant said, '[W]hat have I done, Bro[?]" Mr. Tucker informed Defendant that he had "screwed up," and Mr. Tucker left and went to the store to call his wife.

Chandra Vaughn testified that she and Defendant lived together in February of 2005, and they married in May of 2005. The two were separated at the time of trial. On February 17, 2005, Ms. Vaughn overheard Defendant and the victim argue on two occasions. During the first argument, which occurred around noon, Defendant accused the victim of "messing around" with Ms. Vaughn's sister's ex-boyfriend DeAngelo. The argument "wasn't that bad" and only lasted two or three minutes.

Ms. Vaughn and Defendant later went "somewhere" together after Defendant's first argument with the victim. Ms. Vaughn said that Defendant was acting "strange" and "cold" that afternoon. It appeared to Ms. Vaughn that Defendant had been taking PCP (phencyclidine) because she had seen him high on the drug in the past. She knew that individuals would dip cigarettes in PCP and smoke them, and Defendant had smoked cigarettes after she and Defendant returned home. Ms. Vaughn did not specifically observe Defendant take any drugs that day, and she had never observed Defendant using drugs at their residence.

After Ms. Vaughn and Defendant returned home, he and the victim got into a second argument. Ms. Vaughn was in a bedroom and did not hear the content of the second argument. However, she heard a gunshot in the kitchen and "took off running." As she ran out of the house, she grabbed a four-year-old child out of the bathroom who was visiting at the residence. Ms. Vaughn ran through the kitchen as she went to get the child and saw Defendant with a gun in his hand. He was standing approximately five feet from the victim, who had her hands down by her side. Ms. Vaughn then heard additional gunshots as she ran to get the child and ran back out the door. When Ms. Vaughn left the house, she testified that there was no white, powdery substance on the kitchen floor or on the coffee table in the living room.

Deputy Robert Dillingham of the Perry County Sheriff's Department was dispatched to the Head's residence on February 17, 2005. Defendant was lying face down on the kitchen floor with his arms out like he was about to dive into a pool. Ms. Head told Deputy

Dillingham that Defendant told them that he had been stabbed. Ambulance personnel arrived on the scene, and they did not observe any blood on Defendant. When they rolled him over, they discovered two puncture wounds.

After the emergency personnel began treating Defendant, someone told Deputy Dillingham that there had been a shooting next door. He and Deputy Nick Weems, who had arrived on the scene, walked to the house next door. The gate was closed, but the two officers opened it and walked inside the yard. They went to the front door of the house and announced their presence. There was no response so the officers entered the house. They "cleared" the residence to make sure that no one else was inside and then walked out the back door to "clear" the back yard. The officers found the victim lying on the walkway behind the house with a "steak" knife lying on her chest. Deputy Dillingham, a certified EMT, checked the victim for a pulse but did not find one.

Deputies Dillingham and Weems walked over to a little house on the property and knocked on the door. They knocked on the door two times, and no one answered. Deputy Dillingham then opened the door, and they saw Mr. Hester inside the house. Deputy Weems then ordered Mr. Hester out of the house at gunpoint. Since they did not know who the shooter was at the time, they placed handcuffs on Mr. Hester and put him in the back of Deputy Dillingham's patrol car for their safety.

Special Agent Tenry of the Tennessee Bureau of Investigation (TBI) arrived at the house, and he and Deputies Dillingham and Weems went back inside. They noticed a white powder "all over the floor" in the living room, the kitchen, and the bedroom. There was a a can of Comet cleaner on the edge of the couch and three blood spots on the living room floor. A spent .40 caliber shell casing was found in the doorway between the living room and the kitchen. There was a second shell casing between the doorway of the kitchen and the front bedroom. Concerning items found in the front bedroom, Deputy Dillingham testified:

> Well, the - - when we got to looking and got to finding - - like I said, we found
> this heater here that had blood on it. We found a knife laying just under one
> edge of a sheet that was on the floor. We found two more shell casings in this
> bedroom. Back over here was some shoes and a hat. Then eventually when
> we got to moving the sheet, I threw back part of the sheet that was folded over,
> we found a weapon laying on the sheet.

The weapon was a .40 caliber handgun. Deputy Dillingham testified that one shell casing was found under a cap that was on the bedroom floor and another was "in between the toes of [ ] two tennis shoes."

Deputy Dillingham testified that he found blood on a white truck parked on the road in front of the house. He also found a T-shirt with blood on it lying next to the Head's residence.

Paramedic Beth Jackson testified that she was working for ASI Ambulance Service on February 17, 2005. She was dispatched to a shooting reportedly in the street. However, when she arrived on the scene, she did not see anyone, and a police officer directed her to a stabbing victim in a neighbor's house. Ms. Jackson walked inside the house and saw Defendant lying face down on the kitchen floor. She testified:

Actually, just as I stepped through the door and walked towards him, I think it was probably before I even knelt down beside him to speak to him, he like lunged up out of the floor and there was a lady standing against the sink facing him. And she had on - - best I can remember - - she had on jogging britches, and she had a coat on.

And he grabbed her pant's leg first and when he did, it pulled her pants down, and she bent over trying to pull her pants back up. And he grabbed her coat and pulled her down closer to him and whispered something in her ear, but I couldn't hear what he said.

Immediately after Defendant whispered in the lady's ear, Defendant fell backwards to the floor. Ms. Jackson began asking Defendant what happened, but he had his eyes closed. He would open his eyes if she asked him to open them and look at her. However, Defendant did not respond to any questions. Ms. Jackson testified that Defendant repeatedly said, "she stabbed me." Ms. Jackson took Defendant's vital signs, checked his lungs, and inspected his wounds. She also started an IV and placed him on oxygen. Defendant's "stats" were good, and he was breathing satisfactorily. Defendant's blood pressure was normal, but his heart rate was elevated. Ms. Jackson testified that Defendant had "two little minor puncture wounds . . . probably about the size of the end of your little finger nail . . . One of them was a little bit larger than the other one." The wounds were on the right side of his body.

Ms. Jackson asked Defendant if anyone else was injured, and Defendant said no. After she and Defendant had gone to the ambulance, Ms. Jackson overheard on the radio that another unit was responding to a second victim at the residence next door. Ms. Jackson again asked Defendant if anyone else was hurt, and Defendant said that his sister-in-law had been shot. Ms. Jackson asked Defendant about the gun, and he said that a white male with long blond hair had it.

After Ms. Jackson and Defendant arrived at the Perry County Community Hospital, Ms. Jackson remained with Defendant for a period of time. Defendant told her that the "bitch" went crazy while she was peeling potatoes and "that she just automatically flew into him." He said that they were arguing, and the victim began stabbing him. In Ms. Jackson's opinion, Defendant's wounds appeared to be superficial.

On cross-examination, Ms. Jackson testified that Defendant told her that he had been using PCP that day. In her report, Ms. Jackson made the following notation concerning Defendant: "pupils were dilated, wild-eyed look to his eyes, suspect possible drug activity."

Paramedic Pat Gant with ASI Ambulance Service was dispatched to a residence on February 17, 2005, to assist another ASI unit. When the ambulance in which Ms. Gant was riding arrived at the scene, a police officer directed them to the back of a residence. Officer Dillingham was there with the victim who was lying on the pavement. Ms. Gant detected a faint pulse in the victim, and she noticed a knife laying on the victim's chest. Ms. Gant and other personnel began CPR on the victim and loaded her into the ambulance. She was placed on a monitor, and an attempt was made to resuscitate her. The victim had wounds to her pelvic area, chest, and right arm. Ms. Gant testified that the victim's pulse was lost on the way to the hospital. When they arrived at the hospital, the victim was turned over to hospital staff. Dr. Andrew Averett was the treating physician.

Dr. Averett testified that he examined the victim, who was deceased. She had multiple gunshot wounds; one to her upper arm that had penetrated into her chest, as well as multiple wounds to her pelvic and buttocks area.

Next, Dr. Averett examined Defendant, who was very sleepy, and Dr. Averett had to wake him up. Defendant had two superficial stab wounds to his chest that had already stopped bleeding. Dr. Averett testified that Defendant's mental status was "abnormal" because his speech was slurred, and he was going in and out of consciousness. Defendant also smelled strongly of alcohol, and he had told the intake nurse that he had taken PCP within the previous twenty-four hours. Dr. Averett noted that Defendant acted "intoxicated in some form or fashion," but the intoxication "did not make sense." At times Defendant would be sleepy and difficult to wake, but other times Defendant had "one eye open looking around." Defendant answered Dr. Averett's questions but then became tearful for no reason. He also restated that he had taken PCP. It was Dr. Averett's opinion that Defendant was "under the influence of something pretty heavy." He concluded that Defendant should be transferred to Vanderbilt Hospital because he thought that Defendant had overdosed on some type of drug. Dr. Averett noted that the Perry County Hospital was small and did not have the ability to provide the "higher level of care" that Dr. Averett thought Defendant needed.

Dr. Averett testified that he "asked [his] nurse to get a drug screen from a blood sample" of Defendant.

Dr. Averett testified that Special Agent Tenry of the TBI arrived when he first began performing his physical examination of Defendant. Agent Tenry asked Defendant what happened, and Defendant replied that he shot the victim because she had "been lying" to him and "running around on" him.

Special Agent Jerry Tenry testified that he was instructed to go to the Perry County Hospital as soon as possible on February 17, 2005. When he arrived, the emergency room nurse opened the locked door to the emergency room and pointed to Defendant as the person that he needed to see. Agent Tenry saw Defendant sitting propped up in the bed with an IV in each arm and a bandage on his chest. When he asked Defendant what happened, Defendant replied, "I shot her." Agent Tenry asked Defendant why he shot the victim, and Defendant replied, "the bitch lied to me and I shot her." Agent Tenry recovered a .40 caliber spent cartridge case that had been in Defendant's shoe. As he was leaving the hospital, Agent Tenry asked for a copy of Defendant's emergency admittance sheet. At the same time, someone also handed him a "box of blood vials."

Dr. John Brentley Davis, Assistant Medical Examiner for Davidson County and employee of Forensic Medical, testified that an autopsy was performed on the victim. The cause of death was multiple gunshot wounds, and the manner of death was homicide. Dr. Davis testified that the victim had a total of seven gunshot wounds. Concerning gunshot wound Number One, Dr. Davis testified that it entered the outside of the victim's right arm and traveled into the right side of her chest and went across her chest and was recovered from her left chest cavity. He noted that gunshot wound Number One was the fatal shot and did the most damage to the victim. Dr. Davis testified that the shot penetrated "through her inferior vena cava, put two holes in her heart. And the damage is her right lung and her left lung." When asked if the shot was immediately fatal, Dr. Davis testified:

> Not immediately, no, minutes. She had almost two liters of blood in her chest. And based on her size, that's about two thirds of her blood volume. So she bled out internally, and that could take - - since it hit the largest [vein] in her body, two minutes, ten minutes.
>
> So not a long period of time and not a short amount of time either. The amount of time she was able to move after she was shot here.

Dr. Davis testified that gunshot Number Two entered the left side of the victim's buttock. It went from back to front, "slightly right to left and upward." Gunshot wound

Number Three entered the upper portion of the victim's right buttock. It traveled from back to front and slightly upward. Dr. Davis testified that gunshot wound Number Four was on the left side of the victim's buttock, "more midline where the center of her body is, and that projectile actually went from back to front, slightly to the right and slightly upward also." Concerning gunshot wound Number Five, Dr. Davis testified: "Gunshot wound Number 5 was on her left buttock, slightly lower than the gunshot wound Number 4, went lower down on her buttock and more toward the midline, went toward, what we call the gluteal cleft, my kid calls the butt crack, . . ."

Dr. Davis testified that gunshot wound Number Six was on the victim's "right butt cheek lower down than gunshot wound[s] 4 and 5, kind of a progression down of the gunshot wound from higher up on her butt to further down." The bullet also traveled from back to front and slightly upward a little bit to the right. Gunshot wound Number Seven was to the left side of the victim's vagina, "the labia majora, and that went back to front and a little bit to the right."

> Concerning the victim's position when the shots were fired, Dr. Davis testified:
>
> The fact that all these gunshot wounds, with the exception of the first one, are from back to front and they're higher up, they go from lower down and initially exit higher up on her body indicating that there's some elevation to her hips. One of the entrance wounds is just to the right of the external anal sphincter of her body indicating that she was not sitting up or lying down flat.
>
> For some elevation[] to her hips, her knees had to have been flexed whether she was on her side with her knees flexed up to her chest on the left side or her right side, or she was actually with her head down and her knees on the ground, one of those two positions.
>
> Concerning gunshot wound Number Five, Dr. Davis testified:
>
> Particularly on gunshot wound Number - - I believe, it's Number 5, which is just to the right of the external anal sphincter, it would be difficult to actually hit that and not actually lacerate her butt cheek as the bullet's going in. She had to actually have her hips flexed, her legs flexed to actually hit that part of the body and not cause injuries to the surrounding skin of the body.

Dr. Davis testified that the victim's blood sample was sent to the toxicology laboratory. It tested positive for PCP, a veterinary tranquilizer that causes disorientation, lethargy, hallucinations, and fatigue.

-10-

TBI Special Agent Teri Arney testified as an expert in firearms identification. She examined the .40 caliber cartridge casings recovered from Defendant's residence and determined that they were fired from a pistol that was also recovered in the house.

Special Agent Arney testified that she examined the victim's clothing and was asked to perform a "muzzle-garment distance determination." She found three bullet holes in the victim's hooded jacket. Special Agent Arney testified: "There's one on the outside of the sleeve and just opposite of that, the inside of the sleeve. And then also on the torso area of the jacket." Concerning her examination of the jacket, Special Agent Arney testified:

> I examined it microscopically. I could find no gunpowder particles. I tested it chemically for gunpowder residue. That was also negative. I tested it for lead residue, which would be from vapor from the primer, the cartridge.

> It could also be from the bullet itself. If the bullet picks up lead from the interior barrel of the firearm or if the bullet breaks apart and exposes the interior lead core of the bullet, that can leave a smear around the margin of the hole. We call that bullet white, and that's what I found on all three of these holes.

> In other words, if the periphery of the hole has an area that tested positive for lead, that tells me that's consistent with the passage of a projectile. Because I didn't have any gunpowder residue, I didn't have lead vapor. I couldn't tell you anymore other than it's consistent with the passage of a projectile.

> In other words, I can't tell you a distance that the muzzle of the gun was from that garment.

Special Agent Arney also performed a gunshot residue analysis of the victim's pants. She testified that there were six gunshot holes in the back seam area of the pants and also six holes in the front lower abdomen area of the pants. Special Agent Arney testified:

> I tested both the front and the back areas for the gunshot residues. The holes in the front of the pants, again, had lead white, which is just consistent with the passage of the bullet. The holes in the back seam area of the pants, I was able to get a distance determination on those holes because I found lead vapor.

> I found gunshot powder particles, and I found gunpowder residue in the form of nitrates, which is the chemical test that I was talking about doing. It's a color pattern.

And based on the test patterns that I shot with the pistol submitted, I was able to determine that distance was greater in contact; in other words, the muzzle of the gun was not touching the garment, but it was no farther away than 18 inches.

Special Agent Arney testified that she also examined bullets fragments obtained from the medical examiner's office. She determined that they were fired from the .40 caliber weapon recovered from Defendant's residence.

**Analysis**

*Sufficiency of the Evidence*

In a relatively brief argument Defendant asserts that the evidence was overwhelming that his intoxication prevented him from being able to form the *mens rea* of premeditation, a necessary element of premeditated first degree murder. Defendant also asserts that the evidence was insufficient to establish the aggravating circumstance found by the jury to sentence him to life in prison without parole.

Defendant's argument regarding the sufficiency of the evidence to support his conviction asserts that the weight of the evidence was contrary to a finding that premeditation existed. On appeal the State is entitled to the strongest legitimate view of the evidence and to all legitimate inferences that may be drawn therefrom. *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000). As particularly pertinent to Defendant's assertion that the evidence was insufficient to support his conviction, the credibility of witnesses and the weight to be given their testimony are matters entrusted to the jury, *Id*. at 278, and the appellate court is not permitted to re-weigh the evidence or substitute its inferences for those of the jury. *Id*. at 279. Under these standards, Defendant is not entitled to relief on his challenge to the sufficiency of the evidence to sustain his conviction.

Regarding Defendant's challenge to the sufficiency of the evidence to support application of the aggravating circumstance set forth in Tennessee Code Annotated section 39-13-204(i), we review the evidence under the same standard as we use to review sufficiency of the evidence to support a conviction. Tennessee Code Annotated section 39-13-204(i)(3) states,

> (i) No death penalty or sentence of imprisonment for life without possibility of parole shall be imposed, except upon a unanimous finding that the state has proven beyond a reasonable doubt the existence of one (1) or

more of the statutory aggravating circumstances, which are limited to the following:

\* \* \*

> (3) The defendant knowingly created a great risk of death to two (2) or more persons, other than the victim murdered, during the act of murder;

\* \* \*

On appeal the State relies almost exclusively upon the testimony of Chandra Ewing Vaughn to support its argument that the State proved the specified statutory aggravating circumstance beyond a reasonable doubt. At the sentencing hearing, Ms. Vaughn testified during direct examination that she was in the master bedroom, also referred to as the front bedroom, folding clothes when she heard Defendant and the victim arguing. She then heard "gunshots" and ran toward the bathroom in the house to get the four-year old child Deanna. She testified that the route she took to get the child was "from the master bedroom, through the kitchen, through the hallway to the bathroom." While traveling through the kitchen and hallway Ms.Vaughn was "shielding" herself by placing her hands over her head. When asked by the prosecutor why she was shielding herself, Ms. Vaughn answered, "I didn't know where the bullets were going."

When Ms. Vaughn got to the bathroom, she picked up Deanna "and ran out the back door." Ms. Vaughn explained that she did not go from the bathroom to the front door because "the backdoor was the closest exit." Ms. Vaughn heard more gunshots as she was going out the back door, but she could not say how many she heard. She ran to the neighbor's house while holding the child. Ms. Vaughn testified that the house where the shooting occurred is "small," but she could not estimate the square footage of the house. As she and the child were going out the back door, she was not able to see where Defendant and the victim were located. However, as she went out the back door, she knew that the gunshots were located in the kitchen.

During cross-examination Ms. Vaughn testified that there was no way that Deanna could have seen Defendant while he was shooting in the house. Ms. Vaughn acknowledged that a wall existed between the kitchen where Defendant was shooting the gun and the bathroom where the child was located. During re-direct examination, Ms. Vaughn testified that she saw Defendant and the victim in the kitchen when she (Ms. Vaughn) was traveling from the master bedroom on her way to the child in the bathroom. However, she did not specifically indicate the relative locations of Defendant and the victim inside of the kitchen.

-13-

Because evidence advanced during the guilt phase of the trial can be considered during the sentencing deliberations by the jury, *State v. Teague*, 897 S.W.2d 248 (Tenn. 1995), we will also summarize relevant testimony presented during the guilt phase. In those proceedings Ms. Vaughn testified as follows. During direct examination Ms. Vaughn stated that she heard arguing, and then heard one gunshot prior to running toward the bathroom to get Deanna. Ms. Vaughn also elaborated that on her way to the bathroom she was running close to the wall "[b]ecause when I was coming down the kitchen the hall to where the kitchen wall was, I was close to the wall because I didn't know where – which way the bullets were going." Ms. Vaughn stated that Defendant and the victim were five or six feet apart when Ms. Vaughn went through the kitchen. All that Ms. Vaughn saw when she ran through the kitchen was the victim standing with her hands down by her side and Defendant standing with the gun in his hand.

Also, testimony at trial from the medical examiner showed that seven bullets entered the victim's body. One entered the upper portion of her body, initially into the outside of her right arm, and then through that arm and into her chest cavity where it perforated a major vein and led to the victim bleeding to death. A forensic firearms agent of the T.B.I. examined the hooded sweatshirt worn by the victim at the time of her shooting. This agent testified that she was unable to determine the distance that the muzzle of the pistol was from the victim when the bullet was fired. The medical examiner identified six additional gunshots that struck the victim from behind and below her waist. Based upon the paths of these wounds, the victim was either on her knees with the top of her body bent forward or was on her side with her knees pulled up to her chest when she was shot. The forensics firearms expert witness testified that all six of the gunshot wounds to the victim's lower body were indicated by holes in the back seam area of the victim's pants, and based upon gunshot residue she concluded that in each of these six gunshot wounds the muzzle of the pistol was no farther away than 18 inches from the victim when it was fired. The T.B.I. forensics firearm expert witness provided no testimony regarding the power and force of the .40 caliber pistol and ammunition identified as the cause of the victim's injuries. No witness testified as to the structure of the walls and doors of the house or the ability or inability of the .40 caliber ammunition fired from the pistol to penetrate and pass through the walls or doors of the house.

In a diagram of the house where the victim was shot, Ms. Vaughn labeled the location where Defendant and the victim were standing in the kitchen when she was running to get the child out of the bathroom, the location of the child inside the bathroom, and the route she took to get the child and then take the child out of the house. There is no proof as to whether Defendant or the victim changed their positions in the short period of time it took for Ms. Vaughn to get the child and get her out of the house. Based on the diagram, if Defendant was shooting at the victim, neither the child nor Ms. Vaughn were close to being in the line

-14-

of fire. Ms. Vaughn explicitly testified that she had no idea where any bullets were going, and there was no testimony as to the location of any bullet holes in the house.

The State is entitled to all legitimate inferences that may be drawn from the strongest *legitimate* view of the evidence. *Smith*, 24 S.W.3d at 279. However, from the evidence presented at the trial and sentencing hearing in this case, it would be rank speculation to say that Defendant knowingly created a great risk of death to the child when there is absolutely no proof that she was in the line of fire from the only known spot that Defendant was located when any shooting occurred when the child was inside the house or was leaving the house. Furthermore, there was no proof presented that the bullets fired from the gun used by Defendant did, or even could, penetrate the walls or doors of the house. This court is not permitted to take judicial notice of the firepower of a .40 caliber pistol. The State's theory on sentencing seems to be that in a relatively small house, any person inside the house when a gun is discharged is at a great risk of death, without regard to any evidence of the firepower of the weapon, or the nature of any structures between the shooter and the alleged victim, or even whether there is any physical evidence that any bullets were fired in close proximity of the victim. Since the statutory aggravating circumstance requires that the State prove beyond a reasonable doubt that at least two persons other than the victim murdered must be placed at a great risk of death, Tenn. Code Ann. § 39-13-204(i)(3), the sentence of life without possibility of parole must be reversed. Consequently, upon remand Defendant's sentence shall be modified to life imprisonment.

*Suppression of Evidence*

Defendant filed a pre-trial motion to suppress the toxicology report of his blood drawn at the Perry County emergency room on the night of his arrest. The toxicology report showed that Defendant's blood was negative for the presence of any drugs. This contradicted Defendant's planned theory of defense at trial, that he was unable to form premeditation because he was under the influence of PCP at the time of the offense, and thus could be guilty at most of second degree murder rather than first degree murder. The hearing on the motion to suppress was held on July 12, 2010, the day before the trial was scheduled to begin. Defendant's theory for granting the suppression motion was that the blood draw was a warrantless search by the State in violation of the Fourth, Fifth, and Sixth Amendments to the United States Constitution. Defendant asserted that no exception to the requirement of a search warrant existed. He also claimed that the process by which the toxicology report was produced violated his Fifth Amendment right to be protected against compelled self-incrimination and that use of the toxicology report would violate his Sixth Amendment right of confrontation. The State, for the first time, announced to the trial court at the suppression hearing that its theory was that Defendant's blood was drawn by medical care providers for the purpose of diagnosis and treatment, and therefore did not implicate the Fourth

Amendment. The State failed to address Defendant's claims under the Fifth and Sixth Amendments in its opening statement at the suppression hearing.

The proof in this case showed that Defendant shot and killed the victim. He shot her seven times after they had quarreled, and six of the shots were fired into the victim's buttocks as she lay in a fetal position on her side or while she was on her hands and knees. Defendant's assertion was that he had taken the drug PCP on the day of the shooting and that he was not in his right mind to form premeditation. As to the issues raised in the suppression motion the evidence at the pre-trial hearing is as follows:

Dr. Andrew Averett, a family physician and employee of the Perry County Community Hospital, testified that he was working at the hospital in February of 2005. Although he could not recall the specific night, Dr. Averett testified that he saw Defendant in the emergency room after he had "worked a code on a female." He said that Defendant was brought in because he "he wasn't acting right, and also, because they thought that he had - - was involved in this incident."

Dr. Averett testified that Defendant had a "couple of superficial stab wounds up to his anterior chest" and a "couple of small things down his finger or his hand, arm." Dr, Averett testified that he requested that Defendant's blood be drawn because Defendant's "mental status wasn't normal." Based on his consultation with Defendant, Dr. Averett determined that Defendant should be sent to Vanderbilt Hospital. He did not know what happened to the blood sample once Defendant was transferred to Vanderbilt.

On cross-examination, Dr. Averett testified that he did not recall seeing Defendant's blood being drawn. However, he testified that Defendant was "blasted." He further clarified:

> I don't know how to - - [Defendant] was mentally obtunded, as well as hyper-somnolent, he was tearful at times, and at other times, inappropriately - - (pause) - - I wouldn't say cheerful, but just inappropriately disconnected, in other words, he had an abnormal mental status.

Dr. Averett testified that he was using the blood sample "as a part of trying to determine why [Defendant's] mental status was the way it was." Dr. Averett had also been informed by his nurse that Defendant told her that he was under the influence of PCP. Dr. Averett testified that the blood would not have been tested at the hospital. He said that the normal course of business was for his nurse to give the blood sample to a police officer and "that would be who would then take it to the state lab, and that would be whoever the lead investigator or lead officer at the scene was." He thought that his nurse gave the blood

sample to Agent Tenry. Dr. Averett testified that the fact that Defendant admitted to killing someone was not a factor in his request for the blood sample.

Concerning the blood sample request, Dr. Averett further testified:

Well, what I wanted was so that when he got to Vanderbilt, they would be getting a - - a picture image of what was in his blood at the time that he was in Linden, because with toxicology, time matters. Something that's in your blood now may not be in your blood two or three hours from now.

Dr. Averett noted that the average half-life for PCP was six to fourteen hours. He clarified that he intended for the blood sample to be tested by the "state toxicology lab because they have the best toxicology lab in that state." However, he noted that Vanderbilt would also have access to the sample.

Dr. Averett testified that after Defendant was transferred to Vanderbilt Hospital he was sent back to the county jail. He then cared for Defendant on several more occasions at the Perry County Jail. Dr. Averett made it clear that he did not "do the drug screen to in any way establish or not whether [Defendant] had performed shooting this person, it was purely to aid me and help get a clear picture for the people at Vanderbilt as to his behavior."

Dr. Averett testified that he did not obtain Defendant's consent to draw blood, and that Defendant did not object to having his blood drawn. Dr. Averett acknowledged that the report indicated that the requesting individual was "Sergeant [sic] Jerry R. Tenry." However, it was still his testimony that he requested the blood sample for medical purposes. He said, "I'm sorry if this had been contradictory or seems confusing; I think what happened is my nurse just handed the vial of blood to Mr. Tenry and he took it and had it processed." Dr. Averett further testified: "Now, my purpose in getting a screen on him was because of his mental status and just for medical purposes, because I don't see that it's relevant - - or I didn't see that it's relevant to whether he shot her or whether he didn't." Dr. Averett acknowledged that the emergency room form indicated that Defendant admitted to "PCP use yesterday a.m.," and it noted "positive Etoh." The right side of the form read, "tox[icology] screen per TBI." Dr. Averette testified that Agent Tenry did not ask for Defendant's blood to be drawn.

Special Agent Jerry Tenry testified that he was dispatched to Perry County to investigate the murder of the victim. He initially drove to the Perry County Sheriff's Office but was "rerouted" to the hospital. Special Agent Tenry walked inside the hospital and spoke to a nurse. Agent Carroll arrived shortly thereafter. Special Agent Tenry testified:

I just asked who I needed to talk to. I was given [Defendant's] name, I turned and [Defendant] was to my right. I went to the foot of the bed. At that time, Dr. Averett was there, he went up on one side of the bed, I can't remember . . . and I spoke to [Defendant].

Special Agent Tenry testified that he did not ask Dr. Averett to draw Defendant's blood. Later, as he was leaving the hospital, Special Agent Tenry received a copy of the in-take sheet, and he was "handed the [vial of] blood." He said that he received the vial from the nurse in charge of the emergency room. Special Agent Tenry transported the blood sample to the "crime lab and turned it in." He also completed an "Alcohol and Toxicology Request."

On cross-examination, Special Agent Tenry testified that he was surprised to receive the vial of blood. He said that he did not have any intentions of getting a blood sample from Defendant when he went to the hospital. Special Agent Tenry also retrieved a bullet cartridge from Defendant's shoe while he was at the hospital. He admitted that he did not have to request the blood sample because it was given to him.

After all proof had been presented the trial court denied Defendant's motion to suppress. The trial court's extensive findings, conclusions, and reasoning for denying the motion to suppress, including a colloquoy with one of Defendant's counsel, are as follows:

THE COURT: If the medical evidence in this case were drawn as part of the treatment and diagnosis of [Defendant], then the court believes under our law that it's admissible even though it's now being used in criminal proceedings. If it was drawn at the request of the State of Tennessee, or if the hospital acted as an agent of the State of Tennessee, then the Fourth Amendment is implicated and the question of whether a warrant would've been required under this circumstance would be before the court.

The entire case is presented on the theory that the blood sample was drawn for the purpose of treatment and diagnosis. The proof that's been offered the court through the testimony of Dr. Andy Averett and through the testimony of retired TBI Agent Mr. Jerry Tenry was to the effect that, one, Dr. Averett requested that the sample be drawn, he requested it because of the rapidly changing mental condition that

-18-

he observed in Mr. Vaughn and he wanted that blood sample for the purpose of diagnosis and treatment. Agent Tenry maintains that he did not ask to have the blood sample drawn, that it was handed to him on the way out.

Obviously, there are some real inconsistencies here, because, number one, the document that's been marked Exhibit 3 and that was identified to be in the handwriting of a nurse, Ms. Briley, Judy Briley, or Judith Briley, I think it is, reflects toxicology screen "per TBI," those are the words, "tox screen per TBI."

And then the form that's been marked as Exhibit 1 by Agent Tenry is all in his handwriting, with the exception of the part that says that the sample was collected on February 17th, 2005 at 19:35 p.m. by Tara C. Harris MCT.

Notwithstanding the inconsistencies, the court finds that the sample in question was, in fact, drawn for the purpose of diagnosis and treatment, primarily based upon the testimony of Dr. Averett, because he wanted to essentially establish a baseline, he wanted some evidence to show the content of Mr. Vaughn's blood at the time he was at the Perry County Hospital for later comparisons with whatever was found at Vanderbilt. That makes logical sense.

Now, what doesn't make any logical sense is why you would send it to the TBI knowing it could take a very long time to get back. But I can't necessarily question that decision. At least I know the decision, or I believe the decision was honestly made in order to obtain a baseline for determining what the circumstances were at the time Dr. Averett treated Mr. Vaughn at the Perry County Hospital.

So for that reason, the court will deny the motion to suppress.

-19-

MR. BATES, III:   Your Honor, could I - - I might have to do some research on it tonight, Your Honor, the private action can become simply state action.

THE COURT:   If the private actor becomes the agent of the state, then, according to the reading that I did, it could become state action. So if the proof had been that the blood sample was drawn at the request of the State of Tennessee by Dr. Averett or the nurse who actually, physically, drew it, then the Fourth Amendment would be implicated.

MR. BATES, III:   But then the analysis of it by the state, it becomes government action, the Fourth Amendment - - if the Fourth Amendment did not prevent the blood from being drawn, it prevents it from being analyzed.

THE COURT:   You may be right; I don't read the law that way, Mr. Bates. I think that if the sample was legitimately taken for medical reasons for purposes of treatment and/or diagnosis, then the fact that the State of Tennessee later analyzes it for their own purposes doesn't make it impermissible. Now, you're welcome to look at that question, if I have phrased it correctly, and if I'm wrong about it, advise me in the morning.

MR. BATES, III   All right. One second, Your Honor.

(Counsel conferred, after which the following proceedings were had):

MR. BATES, III   And the other issue is, if the - - of course, every blood sample is drawn by medical personnel, and so we'd like, also, to research if it was done in concert with the State of Tennessee. We'd also like to revisit that issue, as well, Your Honor.

THE COURT:   Any authority you can give me that help me on this question, I'm delighted to look at. But at least for the purposes of where we are tonight, it's this court's

-20-

judgment that your motion should be denied, with all due respect, because I believe that the sample was drawn based upon a decision that Dr. Andy Averett made for medical purposes or diagnosis and treatment. And, after that, if there's something that causes the Fourth Amendment to be implicated, I'll be happy to listen to you.

During the trial, Defendant's counsel renewed the motion to suppress during TBI Agent Tenry's testimony. After a jury-out hearing, the trial court again denied the motion on the basis that its finding, based upon testimony to that point, was that the blood was drawn at the direction of a medical provider for the purpose of diagnosis and treatment. However, during its ruling, the trial court made it clear to the State that the toxicology report generated after analysis by the TBI forensic lab would not be admitted into evidence absent testimony of the chain of custody, to-wit, evidence of who drew Defendant's blood and who had uninterrupted possession of the blood until it was handed to Agent Tenry. The State rested its case at the conclusion of Agent Tenry's testimony and the trial was recessed until the next morning.

The next morning in court, prior to resumption of the trial, one of the State's prosecutors announced that she had spoken via telephone to Ms. Harris, the nurse who had drawn Defendant's blood. The conversation took place the previous evening after the trial had recessed. The prosecutor stated that she had informed Defendant's counsel the previous night about the substance of Ms. Harris' information, and that the State felt the information should be "on the record." The prosecutor said that Ms. Harris remembered the night that Defendant and the victim's body were brought to the ER where Ms. Harris was working. While concise summaries of argument or testimony are generally preferable to lengthy quotes from a trial transcript, we deem it appropriate in this case, with its unique procedural history, to quote at length what transpired during and immediately after the State prosecutor's disclosure. For clarification purposes, Defendant was represented by two attorneys, Mr. Douglas Bates, III, and his son, Mr. Douglas Bates, IV.

[PROSECUTOR]: I had called Mr. Bates last night about 7:40. I was finally able to reach him and told him all of this, but I feel this needs to be on the record.

When I first spoke to Ms. Harris, she told me that she was working in the ER that night. She recalls it because she had dealt with her first dead body, which

-21-

would be [the victim], and that she had worked the code on her.

She stated that she was upset because of that code. And when she came out of the trauma room, she went to [Defendant's] bed to work on him when he came in. While she was there with Dr. Averett treating [Defendant], a TBI agent came in and came up to his bed. She didn't know the TBI agent's name.

She said she recalled the TBI agent talking to [Defendant], but she doesn't recall specific questions and answers. She stated she doesn't recall because she was very upset over the code of the victim and she just really wasn't paying close attention.

She then stated that she heard the doctor and the TBI agent talking. She again doesn't know the specifics of that. She states that Dr. Averett told her to draw the blood, and **she stated that she thinks she heard the TBI agent say, we're going to need blood**.

Now, she doesn't have a reference point for when that occurred. And she said she drew the blood. She drew as much as she could, and she handed it to the agent. I talked to her last night around 6:15. She agreed to accept service of subpoena by phone; however, she lives in Adamsville, which is about 70 miles from here, so she will not be here until about 10 o'clock.

THE COURT:     Mr. Bates?

MR. BATES, IV:     I want to first make a personal observation and my appreciation for the General. When she called last night, it was, I think in view, in the utmost of our profession and I want to thank her for that.

Your Honor, my father and I have spent the last week with the knowledge after Monday's hearing that the blood reports were admissible. After your ruling on

-22-

Monday, our trial strategy had changed. It had not occurred that it would have been a private study based on a private request based on the record.

And we litigated the suppression hearing like it was not and it was a surprise. We have spent hours on this case preparing this week with that blood report coming in. And the fact that the Court now has new evidence doesn't change how we've litigated this case, how we've picked the jury, how we've questioned witnesses, how we've done all of these things.

**We do not renew our motion to suppress this evidence.** In fact, we have no more proof going forward. We will be resting. We will be asking [Defendant] questions for him not to take the stand. We will be putting [sic] our motion for acquittal. **This does not mean we feel that the evidence is properly admissible. We do not waive that argument.**

At this point, Your Honor, it's irrelevant. It didn't come in for procedural reasons. **Substantively, we have been affected by this ruling on Monday that's now based on facts that were just not true.** So because we're not going forward, we're ready to move forward.

[PROSECUTOR]: Your Honor, if I could respond to that. I think at this point the State is not submitting that the facts from Monday are untrue. I think Ms. Harris, obviously, stated at least a couple of times in my conversation with her that she was upset and she was not paying attention.

So I think the issue would be to flush out with her as to whether or not those facts were untrue. I'm just reporting what I found out from her last night. If they're not putting on any proof, then, therefore, we will not be putting on any rebuttal.

And that would mean that we don't need Ms. Harris or Ms. Hopkins that we have on the way. And we would ask for a brief moment to call those ladies off.

THE COURT: Let me thank both counsel for your remarks. When the Court left here Monday, [the day of the suppression hearing] it was obviously a big question in the Court's mind as to why the nurse wasn't called by one side or the other. And the only thing I could conclude was, it was trial strategy that the State or the Defendant had developed based upon interviews with this particular witness.

Now, yesterday when the motion to suppress was renewed, I made it as clear as I could that I felt comfortable with the ruling based upon the evidence I had.

But I also knew that there was no way for that evidence to come into this trial based upon the proof that we had because, as I indicated yesterday, the only evidence that we had was that, one, Dr. Averett had requested a draw. And two, Agent Tenry had been given a vial of blood. That's it.

What happened after the request for the draw was made there was no proof at this point in time and then whether Agent Tenry what he did with the vial, there was no proof at this point in time. I will say depending on what Ms. Harris has to say, this would obviously explain what transpired.

And by that I mean, if what she says is that she overheard a conversation where the TBI agent said, I think we need blood, and the blood was drawn as a result of the comment, then it would completely change the Court's ruling on the motion to suppress.

And I'm prepared to do whatever is proper to make sure that both the State and [Defendant] receive a trial

-24-

that's as clean as I can possibly make it. So if we need to release the jurors for today and bring them back tomorrow and afford the State and Defense an opportunity to talk with this lady, that's what I'll do.

I've struggled with this since Monday because I [k]new this hole in the Court's mind. I didn't know that it existed in either the mind of the Defense or the counsel for the State. But there's, of course, some things that couldn't be explained Monday. The evidence, though, that came before me is what I had to use to rule on the motion to suppress. And I've been through that.

You-all know what I thought about it and what I said about it and I still stand on it. Whatever Ms. Harris [h]as to say may have very well changed that ruling. So let's try to figure out now what makes sense. What the Defense is saying is that their trial strategy was based on the motion to suppress.

And what I'm saying, I'm prepared to send the jury back, take it up tomorrow, take it up Monday, do whatever I need to do to allow this issue to be pursued to make sure that neither side is prejudiced, but I'm not sure that's what either side wants. So in terms of the discovery that was requested in this case, would the discovery have asked for Ms. Harris' name?

MR. BATES, IV:   Your Honor, the witness - - the original discovery requested it for every witness. And General Long stated that the witnesses were endorsed upon the indictment. Ms. Harris' name was not on that. Now, her name was in the discovery packet because she was the nurse that drew blood. But her name on that request was irrelevant because it was requested by Special Agent Tenry.

And pursuant to the statute in which that request comes in, all the State would need was State action is

that the officer who requested it and the lab technician who analyzed it.

THE COURT: When you say the statute under which the report - - do you mean the report comes in? You're saying the reports coming in under The Business Record Act?

MR. BATES, IV: That's correct.

THE COURT: Well, the problem is that the information contained in the report is quote, "testimonial," in nature, then the Fourth [sic] Amendment is implicated. That's the problem.

MR. BATES, IV: That's correct. And that was the reason the thrust of our suppression was it was State action. It was never contemplated by us that it was not State action based upon the record of the toxicology request was requested by Special Agent Tenry.

MR. BATES, III: May I confer with my son?

MR. BATES, IV: **And, Your Honor, the point is we are not asking for a mistrial**. We have tried this case. You gave us a right turn; we took it. And we have litigated this case with that report coming in.

THE COURT: The question I have to you is, do you believe that your client has been prejudiced, potentially, based upon the information that's been brought to light between the adjournment of court yesterday and the reconvening of court today?

MR. BATES, IV: May I have a minute.

THE COURT: Sure.

MR. BATES, IV: Your Honor, here is our position that the case changed based on Monday's ruling that the blood report was inadmissible [sic]. We've tried our case. We have

tried as hard as we can. We are not asking for a mistrial.

**We are not asking for a delay to examine Ms. Harris in light of what she said.** We've tried this case with the assumption that that report was coming in and we are not asking for a mistrial. We are moving forward.

THE COURT: I understand what you're saying, but you understand that if Ms. Harris' testimony had been offered Monday and if she said that the only explanation she's got for the words on that report that she wrote in her handwriting, TOX requested by TBI or something to that effect, I don't remember the precise words, but it's something to that effect.

The only explanation she can give for those words is the fact that she was there and it's her best recollection that she heard a TBI agent say, I think we need blood. That would very well change the Court's ruling.

MR. BATES, IV: We understand that. Let me elaborate. If the motion was suppressed on Monday, I believe, if Ms. Harris would say the things the General says, I believe, the Court based on its reasons, suppressed the evidence.

THE COURT: Correct.

MR. BATES, IV: **Procedurally, we would be in - - just at a glance - - we would be in the same position we're in right now, which is the report would not be in evidence. It would not be for the juror's consideration.**

THE COURT: Let me interrupt. It's my recollection it's been marked as Exhibit Number 47.

[PROSECUTOR]: Your Honor, Exhibit 47 is the - -

THE COURT:      The sheet?

[PROSECUTOR]:   The Perry County Hospital records.

THE COURT:      The ER sheet?

[PROSECUTOR]:   Yes.

THE COURT:      Okay.

[PROSECUTOR]:   The toxicology report is not.

THE COURT:      So the toxicology report - - exhibit - - that sheet doesn't have any results on it.

[PROSECUTOR]:   No, Your Honor.

THE COURT:      All right. Then my question to you is, does it change your - - I understand the trial would be the same and in the same posture that we're in right now, but would it change your recommendation to your client on whether he should or should not testify? Or would it change your decision on whether to call or not call witnesses? I understand we would be in no different place concerning the trial.

MR. BATES, IV:  It is hard for me to separate the past three days. It's hard for me to say, let's now go back and start in voir dire with the assumption that the test is not coming in. **I cannot answer [the] Court's question. I don't know how I would feel had the report never been admissible.**

THE COURT:      All right. Here's what I'm going to do - -

MR. BATES, IV:  **But we're not asking for a mistrial.**

THE COURT:      I'm going to take a short recess. I want the State to confer - - the two lawyers that represent the State - - to confer with one another to just sort of sum up in their

-28-

minds where we are. I want the Defense counsel to do the same.

And the issue I want each of you to think about is, one, I am suggesting that we would let Ms. Harris come here and hear what she's got to say with a jury-out hearing. It may or may not change my ruling on the motion to suppress.

Would that then change the decision either the State has made in terms of resting? And would it change the decision that the Defense has made in terms of putting on evidence? It may be when you come back in short order.

I don't want you to spend a whole lot of time doing this, but it may be when you come back you're saying, the State still rests, Defense puts on no evidence.

[PROSECUTOR]: Your Honor, just so I can give Mr. Bates - - I can answer that question for you now.

THE COURT: All right.

[PROSECUTOR]: It would not change how we perceive it. We decided on Monday night regardless of the decision that was made on Monday, we made the decision that we were going to use Ms. Hopkins in rebuttal. And we found case law that said, even if you had suppressed that evidence for our case in chief, we could have still used that evidence in rebuttal.

THE COURT: And you said, "Ms. Hopkins." I had written Ms. Harris. Is her name, Hopkins?

[PROSECUTOR]: Ms. Hopkins is the one who performed the actual result. Ms. Harris, really, Your Honor, until you made that statement yesterday, it did not click with me that we had not subpoenaed her to say that she took the defendant's blood.

THE COURT:        Okay.

[PROSECUTOR]:     Even though on Monday, I heard that testimony that neither Dr. Averett nor Agent Tenry saw the blood drawn. It wasn't until you said it yesterday that I thought we need to get Ms. Harris here. So even in that regard, she would have been for rebuttal.

THE COURT:        You're talking about Ms. Hopkins would be for rebuttal?

[PROSECUTOR]:     Ms. Hopkins and Ms. Harris would have both been in rebuttal. They would have never been in our case in chief.

MR. BATES, IV:    **Your Honor, if that's the case, then we're in no different position right now than had the suppression - - regardless the suppression, regardless of whether Ms. Harris was going to have to come or not, we'd be in the exact same position, which is as soon as the General said yesterday, I rest, I immediately said, I've got to go research rebuttal law.**

                  And so we'd be in the exact same position whether or not that was suppressed or not. I admittedly did not know about the case that she referred to. She said if it was suppressed it could still be used as rebuttal evidence. So in light of what the - -

[PROSECUTOR]:     I would like to say just for the record, that's State versus Electro Cleaning, Inc. and Frosting, Inc. (phonetic).

THE COURT:        What's the citation?

[PROSECUTOR]:     It's a Court of Criminal Appeals case number, or case, Your Honor, 1998 Tennessee criminal appeals. Here it is in front, [*State v. Electroplating, Inc.*, 990 S.W.2d 211, 226 (Tenn. Crim. App. 1998)].

-30-

THE COURT: And that case stands for the proposition that the proof could be introduced even if the motion to suppress had been granted?

[PROSECUTOR]: Correct, Your Honor, in rebuttal, even if the Court had found that the evidence was illegally obtained.

THE COURT: Do you want to read that case, Mr. Bates?

MR. BATES, IV: No, Your Honor. Now that I see the State's strategy was to put me in this box all along, I'm in the same box I'd be in regardless of what Ms. Harris would say.

THE COURT: All right. Then the State has rested and the State remains in that posture; is that correct?

[PROSECUTOR]: That's correct, Your Honor.

THE COURT: And the Defense elects to call no witnesses and put on any proof?

MR. BATES, IV: Your Honor, I do believe I need to - -

THE COURT: I mean, we're going to talk with your client on the [*Moman*] issue, but am I correct that's where the Defense is?

MR. BATES, IV: That's correct, Your Honor.

(emphasis added).

At the hearing on Defendant's motion for new trial, the trial court, *sua sponte*, brought up the precise issue of Defendant's motion to suppress the toxicology report. The trial court referred to an affidavit of the nurse, Ms. Harris, which had been filed by Defendant for consideration at the motion for new trial. The affidavit clearly indicated that Agent Tenry responded affirmatively in the ER when the physician on duty, Dr. Averett, asked Agent Tenry if he wanted a blood sample from Defendant. After hearing argument from Defendant's counsel the trial court framed the issue before it as follows:

but the thrust of the argument, as I get it is this: because of perjured testimony, the court ruled erroneously at the suppression hearing. The defense then planned its entire case around that ruling. It's now become evident that had the suppression motion been granted, the case would have been tried differently. And the defense contends that their client has been prejudiced by virtue - - now, I don't want to paraphrase for the defendant what it is they're trying to say, but that's what I get from it.

During argument by the State prosecutor (who was not one of the prosecutors pre-trial or during the trial) the trial court stated, "I've found that Agent Tenry testified falsely . . . . If [Agent Tenry] did request the [blood] draw and he did it and he got it without a warrant, I should have suppressed it." In his final argument to the trial court at the motion for new trial, the prosecutor made an assertion, though couched in terms of sufficiency of the evidence to support the conviction, which appears to argue that Defendant should not be awarded a new trial because even if the trial court erred by denying the suppression motion, no prejudice occurred because of the overwhelming evidence of guilt. The prosecutor never objected to the trial court considering the precise issue of whether it erred by denying the motion to suppress.

In its ruling at the motion for new trial hearing the trial court acknowledged that, based upon evidence which came to light concerning what the trial court found to be false testimony by the TBI agent, it should have granted the motion to suppress evidence. The trial court did not conclude that Agent Tenry's false testimony was the legal basis for suppression of the evidence. Rather, the trial court concluded that had Agent Tenry testified truthfully, then the facts thus revealed would have been a legal basis to grant the motion to suppress. In granting a new trial the trial court stated in part:

> But at the suppression hearing, and if you listen to the tapes, you'll hear the questions I asked, not just of Agent Tenry, but, also of [Dr.] Averett, I mean, I asked probing questions because it made no sense to me why you've got a medical doctor saying that this blood is being drawn simply for the purpose of treatment and diagnosis when you've got a document coming straight out of the hospital saying it's being sent to the toxicology lab per the request of the TBI. It just made no sense.
>
> But notwithstanding the fact that it made no sense, I had no countervailing evidence that I could rely on and overruled the motion to suppress. But when I did that, then I created a foundation for this trial to proceed on, and what we now know is, that foundation was on sand, it wasn't on rock. So the entire predicate for this trial is based upon false testimony, an important

-32-

ruling in this case on whether to suppress or not suppress the evidence was based upon false testimony.

And the concern I have now is, that for me to overrule this motion for a new trial, I have to engage in rank speculation. And the speculation is that, well, if I had done what I should have done, and that's to suppress the evidence, and the defense then put on its testimony and the state came back with rebuttal and I gave an appropriate limiting instruction, would this jury have still found the way it did? There's certainly evidence there that would have warranted them doing that, I don't disagree with that.

But I've just - - I've practiced law too long and I've worked in the legal system too long to believe that a court should countenance perjured testimony in an important issue on whether or not to admit or deny the admission of a toxicology report and to turn my back on that and say, "Yeah, well, I think the jury would have found what they did even if they'd of known the truth." I can't do that, just cannot do that. The court will grant the motion and award Mr. Vaughn a new trial.

In a written order granting a new trial, the trial court substantially stated the same facts and grounds for granting the new trial as it set forth from the bench in open court. Also included in the order granting a new trial is the following:

Had Agent Tenry admitted at the suppression hearing that he requested the blood draw, which he did as evidenced by the clear recollection of Ms. Harris set forth in her Affidavit in support of Mr. Vaughn's Motion for New Trial and as evidenced by the records of the Perry County Community Hospital, **the Court would have granted the Motion to Suppress**. Mr. Vaughn would have been free to plan his defense accordingly. It may be, as the State contended at the hearing on the Motion for New Trial, that the State could have been able to present the suppressed evidence in rebuttal. Whether the State would have offered to do so and how the Court would have ruled upon objections by the defense is pure speculation. The fact is that the Motion to Suppress was overruled because of perjured testimony. Mr. Vaughn was convicted of 1st Degree Murder and sentenced to life without the possibility of parole. A critical stage in the process was the hearing on Mr. Vaughn's Motion to Suppress. For the Court to now disregard the perjured testimony and hold, as the State urges, that the "[f]acts stated by the defendant failed to prove perjury by any witness . . . [a]t most the defendant has shown conflicting recollections between three

-33-

witnesses of an incident that occurred over five year ago," would be a gross abdication of the Court's responsibility.

The circumstantial evidence offered at the hearing on the Motion to Suppress indicated that the blood draw was requested by Agent Tenry. Such evidence includes the inconsistencies in the testimony of Dr. Andy Averett; the unexplained notation on the record of Perry County Community Hospital, "Tox Per T.B.I.;" Agent Tenry's being unexpectedly handed a vial of Mr. Vaughn's blood as he was leaving the hospital; and the failure to see to it that Mr. Vaughn's blood was transported with Mr. Vaughn to Vanderbilt if the true reason of the draw was to establish the content of Mr. Vaughn's blood at the Perry County Community Hospital for comparison with his blood content upon his arrival at Vanderbilt. However, in the face of the direct evidence offered by Dr. Andy Averett and Agent Jerry Tenry, the Court had no choice but to deny the Motion to Suppress. Now that the true facts and circumstances surrounding the blood draw have been brought to light through the Affidavit of Ms. Tara C. Harris Horan, it is clear that the inconsistencies at the hearing on the Motion to Suppress cannot be reconciled.

(emphasis added)

Aggrieved by the trial court's order granting a new trial, the State sought and was granted an appeal pursuant to Tennessee Rule of Appellate Procedure 10. This court reversed, holding that the trial court erred by granting the new trial based upon prosecutorial misconduct. *State v. Cornell Remont Vaughn*, No. M2011-00067-CCA-R10-CD, 2012 WL 1484191 at *12 (Tenn. Crim. App. Apr. 26, 2012) *perm. app. denied* (Tenn. Aug. 16, 2012).

In the present appeal the State asserts that Defendant has waived his right to have this court review the trial court's order denying Defendant's motion to suppress because the issue was not specifically presented in the motion for new trial. *See* Tenn. R. App. P. 3(e) ("no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . , unless the same was specifically stated in a motion for new trial; otherwise such issues will be treated as waived.") For purposes of addressing this issue, we agree with the State that the issue was not specifically stated in the motion for new trial. However, Rule 2 of the Tennessee Rules of Appellate Procedure permits the suspension of the requirements of Rule 3(e) of the Tennessee Rules of Appellate Procedure in this case. At the hearing on the motion for new trial, the trial court *sua sponte* addressed the issue of its denial of the suppression motion. In fact, the trial court determined that it had committed error by denying the suppression motion in light of evidence presented at the hearing on the motion for new

-34-

trial. At that hearing, the State did not object to the trial court addressing the issue on the basis that it was not specifically stated in the motion for new trial. After implicitly consenting to the issue being addressed at the trial court level, the State can not now raise the waiver issue on appeal. Furthermore, Tennessee Rules of Criminal Procedure 33, which governs procedures for hearing motions for new trial provides in its first sentence that , **"[o]n its own initiative or** on motion of a defendant, the court may grant a new trial as required by law." (*emphasis added*). Certainly, if the trial court is specifically authorized to grant a new trial completely on its own initiative, it can address any issue on its own initiative even if that issue is not included in a defendant's motion for new trial.

Apparently assuming that this court would agree that Defendant had waived the issue, the State did not directly address the merits of the suppression issue but instead argued extensively that Defendant was not entitled to relief under the "plain error" doctrine. *See State v. Lowe-Kelley*, 380 S.W.3d 30, 33 (Tenn. 2012); Tenn. R. App. P. 36(b). Since we conclude that the issue is not waived, we need not address the plain error analysis set forth by the State. The trial court concluded that Defendant's blood was drawn without a warrant, implicitly finding that no exception to the warrant requirement existed. In fact, the State's only argument was that the blood draw was not a search since government action was not the basis for withdrawal of the blood. In this court's opinion in the Tennessee Rules of Appellate Procedure 10 appeal, the issue addressed by this court was whether the trial court erred by granting a new trial based upon prosecutorial misconduct. Any other issues addressed are *dicta*.

Nevertheless, even though the trial court clearly concluded at the motion for new trial hearing that it had erred by denying Defendant's suppression motion, the error was harmless beyond a reasonable doubt. Even though the jury was made aware by direct and circumstantial evidence that blood was drawn from Defendant and that the blood was given to an agent of the TBI, and by inference had been, or could have been, sent with other physical evidence to the TBI laboratory for forensic evaluation for the presence of drugs, the actual blood toxicology test results showing no presence of PCP or other drugs was *never* shown to the jury. Also, the result of that test was never mentioned by any witness during the trial. Thus, there was only a minimal amount of evidence covered by the suppression motion which was actually presented to the jury. Also, evidence of Defendant's history of PCP usage was presented to the jury as well as testimony that showed Defendant was under the influence of or was intoxicated by a substance at the time of the offense.

Finally, the position taken by Defendant at the conclusion of the trial, when the State's prosecutor stated on the record that Nurse Harris indicated that the blood was drawn at the TBI agent's request, also prevents this court from granting a new trial. We have extensively quoted above from the trial transcript as to what occurred. Though obviously caught in the

type of perfect storm which sometimes occurs in the midst of a hotly contested trial, and without the benefit of Ms. Harris' affidavit, which was later obtained, counsel for defense had to make a strategic decision. Trial counsel had a little more than twelve hours notice of the new development prior to court reconvening. Trial counsel clearly made a decision to not request a mistrial and to not accept the trial court's offer to suspend the trial until Ms. Harris could be examined in court after sufficient preparation time for counsel over the weekend. We are compelled to conclude that Defendant's counsel made a well reasoned choice between concluding the trial in the manner done, or reopening the suppression issue with additional evidence during the trial. Accordingly, Defendant is not entitled to relief on this issue.

*Double Jeopardy*

Defendant asserts that his constitutional right to be protected from double jeopardy was violated when he was sentenced to serve life without possibility of parole after the first jury which heard his case rejected that sentence and imposed one of just life imprisonment. This issue, and Defendant's "suggestion" that Tennessee Code Annotated section 39-13-204(k) is unconstitutional, are moot in light of our conclusion that there was insufficient evidence to prove beyond a reasonable doubt the sole statutory aggravating circumstance found by the jury.

After a thorough review, we affirm Defendant's conviction of first degree murder. We reverse the sentence of life without possibility of parole and remand this case to the trial court for entry of a judgment of conviction of first degree murder with a sentence of life imprisonment.

_____
THOMAS T. WOODALL, JUDGE